J-S11035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FEROCK SMITH | : | |
| | : | |
| Appellant | : | No. 1698 EDA 2023 |

Appeal from the PCRA Order Entered June 1, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006875-2009

BEFORE: BOWES, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED SEPTEMBER 10, 2024**

Appellant, Ferock Smith, appeals from the order dismissing his first petition filed under the Post Conviction Relief Act ("PCRA").[1] We affirm.

The trial court summarized the factual background of this case:

In the early morning hours of July 18, 2008, the decedent, Barry Jacobs Jr., was selling crack cocaine in the Liddonfield public housing development in the Holmesburg neighborhood of Philadelphia. Antoinette Gray went to Liddonfield to purchase crack cocaine. Co-defendant Alonzo Ellison approached Gray to sell her crack cocaine but Gray declined due to its poor quality. Gray was then approached by Jacobs, from whom she bought $10 worth of crack cocaine. After Gray completed the transaction with Jacobs, as she headed to a friend's house in the area to use the drugs, [Appellant] and co-defendants Ellison and Mikechel Brooker approached Jacobs. [Appellant] shot Jacobs in the head. Jacobs fell to the ground and Ellison and Brooker began shooting him as well, striking him in the head and chest. The three men then fled

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

toward the parking lot. [Appellant] was not licensed to carry a firearm on the day of the murder.

At approximately 2:30 a.m. on the morning of July 18, 2008, police responded to a report of a shooting on the 8700 block of Glenloch Place in the Liddonfield public housing development where they found Jacobs lying on the ground unresponsive with multiple gunshot wounds. Jacobs was pronounced dead by responding medics at 2:36 a.m. The medical examiner observed that Jacobs had multiple gunshot wounds including one to his right shoulder, one to his left chest, one to the front of his face, three perforating wounds to the side of his face, and a graze wound to his ear. The medical examiner determined that either the shot to the front of Jacobs' face or the shot to his left chest would have been fatal alone and determined that his manner of death was homicide.

The day after the shooting, Gray was at her friend's house where all three co-defendants had gathered. The three men discussed committing the murder and began laughing about Jacobs' death.

PCRA Court Opinion, 9/13/23, at 5-6 (citations and footnotes omitted).

On July 16, 2012, a jury found Appellant guilty of murder in the first degree, conspiracy to commit murder, carrying a firearm without a license, and possession of an instrument of crime.[2] On December 17, 2012, the trial court sentenced Appellant, who was a juvenile at the time of his offense, to 50 years to life imprisonment for first-degree murder, as well as a concurrent term of 6 to 12 years' imprisonment on the firearms charge. The court imposed a term-of-years sentence rather than a life without parole sentence for first-degree murder in light of the then-recent decision of *Miller v. Alabama*, 567 U.S. 460 (2012), which held that mandatory life without parole

_____

[2] 18 Pa.C.S. §§ 2502(a), 903(a)(1), 6106(a)(1), and 907(a), respectively.

sentences for individuals under the age of 18 at the time of their crime violated the Eighth Amendment prohibition on cruel and unusual punishment.

Appellant filed a timely appeal, and this Court affirmed his judgment of sentence. *See Commonwealth v. Smith*, No. 188 EDA 2013, 2014 WL 10575374 (Pa. Super., filed Sept. 23, 2014). Appellant filed a petition for allowance of appeal, which our Supreme Court denied on April 29, 2015. *See Commonwealth v. Smith*, 114 A.3d 1040 (Pa. 2015) (table).

On March 22, 2016, Appellant filed a timely *pro se* petition.[3] PCRA Counsel was appointed to represent Appellant, who filed an amended petition and then three supplemental petitions. In his latter two supplemental petitions, counsel raised the issue of whether the trial court complied with the requirements of *Miller* when imposing sentencing upon Appellant for first-degree murder and whether trial and direct appeal counsel were ineffective for failing to object to the procedure employed. Upon motion by the Commonwealth, the PCRA proceedings were stayed in 2018 pending a determination of whether a discretionary term-of-years sentence imposed on a juvenile may be so long as to trigger the protections of *Miller*.

While the case was stayed, Appellant's appointed PCRA counsel passed away, and he retained private counsel to pursue his claims. On February 23,

_____

[3] Appellant's judgment of sentence became final on July 28, 2015, the last day upon which he could have sought review in the United States Supreme Court. *See* 42 Pa.C.S. § 9545(b)(3); U.S.Sup.Ct.R. 13. As Appellant's petition was filed within one year of that date, the petition was timely. *See* 42 Pa.C.S. § 9545(b)(1).

2022, our Supreme Court held in **Commonwealth v. Felder**, 269 A.3d 1232 (Pa. 2022), that "[s]o long as the sentence imposed is discretionary and takes into account the offender's youth, even it amounts to a *de facto* life sentence, **Miller** is not violated." **Id.** at 1246. The stay was lifted, and privately retained counsel filed two additional amended petitions on Appellant's behalf, with the October 14, 2022 filing being the operative pleading. The PCRA court granted an evidentiary hearing on two issues raised by Appellant in that proceeding: (1) a claim under **Brady v. Maryland**, 373 U.S. 83 (1963), regarding the Commonwealth's alleged failure to provide Appellant with an exculpatory statement made to police by James Robinson, an alleged eyewitness to the shootings, and (2) an ineffective assistance of counsel claim concerning advice on a plea offer. **See** N.T., 3/2/23, at 3-5 (PCRA court granting hearing on two claims and Appellant withdrawing the remaining three claims asserted in the October 14, 2022 petition).

At the June 1, 2023 hearing, Appellant elected to proceed only on the **Brady** claim. **See** N.T., 6/1/23, at 4-9.[4] Robinson was the sole witness to testify at the hearing. The PCRA court accurately summarized Robinson's testimony in its opinion:

> Robinson testified that, in the early morning hours of July 18, 2008, he was sitting in his car in the parking lot of the Liddonfield public housing development talking with his then-girlfriend

_____

[4] Appellant's counsel also made clear at the hearing that he was not pursuing an after-discovered evidence claim based upon Robinson's statement. **See** N.T., 6/1/23, at 7-9.

Tiffany. [*Id.*] at 12-13, 38-39, 46. A blue four-door car pulled into the parking lot, parked, and the decedent, Barry Jacobs, Jr[.] approached it. *Id.* at 15, 19, 41. Three men got out of the car and started walking toward Jacobs. *Id.* at 15. However, one of the men got right back into the driver's seat. *Id.* at 15, 41, 50. Robinson had never seen these men before and has never seen them since that day. *Id.* at 15-17, 29, 41-42. Jacobs and these unknown individuals began to argue. *Id.* at 15. The fight became physical and, after approximately 20-30 seconds, the two men outside the car began to shoot at Jacobs. *Id.* at 15, 18-19. The two men ran back to the blue car and all three men left the scene. *Id.* at 20, 50. Robinson and Tiffany left right after. *Id.* at 20, [50-]51. Robinson drove Tiffany to North Philadelphia and dropped her off at her house on "a little small side street" off Allegheny Avenue. *Id.* at 53-54.

Robinson described one shooter as approximately 5 feet 10 inches tall and 200 pounds with a light complexion. *Id.* at 15, 42. The other shooter was approximately 6 feet tall and 200 pounds with a dark complexion. *Id.* at 15, 42-43. He described the driver as approximately 5 feet 10 inches tall and 200 pounds with a medium complexion. *Id.* at 41. He stated that the shooters both used black automatic handguns. *Id.* at 49-50. Robinson, who had known [Appellant] from the neighborhood for approximately 5 years at the time of the murder and had seen [Appellant] approximately 100-200 times in the year or two before the murder, stated that he did not see the [Appellant] at the scene during the shooting. *Id.* at 14, 17.

Robinson returned to Liddonfield on the morning after the shooting. *Id.* at 55. He was only there a few minutes before four detectives arrived in a silver Taurus, "grabbed" him, and brought him to the Homicide unit in handcuffs. *Id.* at 20-21, 57-59. He stated that all four detectives went back to the [H]omicide unit in the silver Taurus with Robinson seated in the middle backseat between two of the detectives. *Id.* at 57-59. The two detectives in the back with Robinson were the detectives that questioned him at [H]omicide. *Id.* at 58. Robinson did not remember the names of any of the detectives that picked him up but described the two detectives that questioned him as "white, older, gray hair, skinny, kind of tall." *Id.* at 24, 57.

Robinson was at the [H]omicide unit for "two or three days" as detectives pressured him to implicate [Appellant] and his co-defendants. *Id.* at 21, 25, 29. Detectives told Robinson that if

he did not implicate [Appellant] and his co-defendants, he would be charged for marijuana found in his cell while he was previously incarcerated. *Id.* at 21-23, 62-64. Robinson stated that the detectives seemed to be focused on co-defendant Ellison and kept showing Robinson video of Ellison, who was in the next room. *Id.* at 66-68. When Robinson refused to implicate [Appellant] and his co-defendants, detectives took him to a police district office where he was charged for the marijuana found in his cell. *Id.* at 62-64, 71. He was then taken back to the [H]omicide unit and placed in the same interview room but was not asked anymore questions before he was released. *Id.* at 23, 62-64, 71. Robinson stated that he did not think any of the detectives were taking notes during his questioning and that none of the detectives believed his story. *Id.* at 24-25.

Robinson heard [Appellant] was on trial for murder from people in the neighborhood, but Robinson was incarcerated during the trial. *Id.* at 25-26, 72-73. He stated that he could have reached out to [Appellant's] family but that he did not let anyone know that he could testify on behalf of [Appellant] because he was incarcerated. *Id.* at 26-28, 72-73. He believed that the defense knew he was a witness but did not need him to testify. *Id.* at 27-28. No defense attorney or investigator ever came to interview Robinson. *Id.* at 27-28. Robinson never reached out to the police or district attorney's office to tell them that [Appellant] was wrongly convicted. *Id.* at 30. Furthermore, Robinson saw [Appellant] while they were both incarcerated at Philadelphia Industrial Correction Center [] during the time [Appellant] was awaiting trial, but Robinson did not tell [Appellant] he could testify to [Appellant's] innocence. *Id.* at 74-75. Robinson stated that he did not think his testimony would help [Appellant]. *Id.* at 75.

PCRA Court Opinion, 9/13/23, at 8-10. Appellant also submitted into evidence a copy of a Philadelphia Police Department incident report reflecting that Robinson was "transported to Homicide by Police" on the date of the shooting from the Liddonfield public housing development. Exhibit D-1; N.T., 6/1/23, at 10. The report did not reflect that any statement was taken from Robinson at the Homicide unit. *See also* N.T., 6/1/23, at 82-83 (PCRA counsel arguing

that trial counsel would only have had the incident report reflecting Robinson's name and that he was transported to the Homicide unit).

At the conclusion of the hearing, the PCRA court dismissed Appellant's petition, finding that there was no *Brady* violation because Robinson's testimony as to the statement he provided to detectives was not credible and further that Appellant had not shown prejudice. *See id.* at 89-91; Order, 6/1/23. Appellant then filed this timely appeal, in which he raises a single issue before this Court:

> Did the PCRA court apply an incorrect standard when evaluating the testimony of James Robinson – resulting in an abuse of discretion in finding him not credible and an incorrect legal finding that the Commonwealth did not violate *Brady*[]?

Appellant's Brief at 3.

We review the denial of PCRA relief to decide whether the PCRA court's factual determinations are supported by the record and its legal conclusions are free of error. *Commonwealth v. Small*, 238 A.3d 1267, 1280 (Pa. 2020). When supported by the record, the PCRA court's factual findings and credibility determinations are binding on this Court, but we review the lower court's legal conclusions under a *de novo* standard of review. *Id.* Our scope of review is limited to the findings of the PCRA court and the evidence of record, which we view in the light most favorable to the Commonwealth, the party who prevailed below. *Id.*

Under *Brady*, a defendant's right to due process is violated when the prosecution withholds material evidence that is favorable to him. *Brady*, 373

U.S. at 87; **Commonwealth v. Benvenisti-Zarom**, 229 A.3d 14, 26 (Pa. Super. 2020).  To establish a **Brady** violation, the defendant must prove each of the following three elements: (1) that the evidence at issue is favorable to him, either because it is exculpatory or because it impeaches; (2) that the evidence was suppressed by the Commonwealth, either willfully or inadvertently; and (3) that he was prejudiced.  **Commonwealth v. Conforti**, 303 A.3d 715, 725-26 (Pa. 2023); **Commonwealth v. Bagnall**, 235 A.3d 1075, 1086 (Pa. 2020); **Benvenisti-Zarom**, 229 A.3d at 26.

Appellant argues that the PCRA court "applied an incorrect standard for evaluating" Robinson's PCRA testimony for the purpose of a **Brady** claim, "using the sufficiency standard, which entails adoption of the record in the light most favorable to the Commonwealth."  Appellant's Brief at 16, 19-20. According to Appellant, the PCRA court's error derived from its credibility finding that "cast doubt on the very existence of Robinson's statement to the police . . . and determined that there was no likelihood that the jury would have credited Robinson's testimony and changed the outcome of the trial." *Id.* at 20-21.  Rather, the PCRA court should have compared "any weaknesses in Robinson's testimony with the glaring and much more pervasive weaknesses" in the Commonwealth's case, including that of Antoinette Gray who admitted she was high on crack cocaine at the time she witnessed the killing.  *Id.* at 21-22.  Appellant avers that "given the weakness of the alleged eye-witness testimony, it would seem extremely likely that the introduction of Robinson's alternate narrative would have served to put the case in an entirely

different light, and to expose the weaknesses in the Commonwealth's case." *Id.* at 22-23.

We find Appellant's argument to be unpersuasive, as he skips directly to the prejudice prong of the **Brady** test without addressing the threshold question of whether there even existed evidence favorable to him that would have triggered the Commonwealth's obligation under **Brady**. **See Conforti**, 303 A.3d at 725-26. The only record of Robinson's involvement with police is the incident report demonstrating that he was transported from the Liddonfield public housing development to the Homicide unit on July 18, 2008. Exhibit D-1. While Robinson's interaction with police on that date appears very likely to be connected to the investigation of Barry Jacobs Jr.'s killing, the incident report by itself does not establish that Robinson made a statement to police, let alone that the statement was favorable to Appellant. Rather, to find that Robinson did make a statement that would have required disclosure by the Commonwealth pursuant to **Brady**, the PCRA court was required to accept as true Robinson's testimony that he informed the Homicide detectives that he saw the three individuals involved in Jacobs' killing and none of them were Appellant.

The PCRA court did not find Robinson's testimony to be credible and thus concluded that Appellant had not met his burden of proving the existence of exculpatory or impeaching evidence. N.T., 6/1/23, at 90-91; PCRA Court Opinion, 9/13/23, at 8, 12. As the court explained, "the only evidence that Robinson actually made a statement to detectives exculpating [Appellant] was

Robinson's own testimony. Since the Court found Robinson's testimony to be incredible, [Appellant] did not prove the Commonwealth concealed exculpatory evidence." PCRA Court Opinion, 9/13/23, at 12.

The PCRA court stated several reasons for finding Robinson incredible. First, the court observed that Robinson did not come forward with his account exonerating Appellant for more than 14 years after the murder. Robinson even saw Appellant, who he knew well, in jail shortly after the incident, and Robinson failed to mention to Appellant that he could provide testimony that would assist Appellant in his upcoming trial. PCRA Court Opinion, 9/13/23, at 11 (citing N.T., 6/1/23, at 25-28, 34, 72-77). The court additionally noted that, although Tiffany, who was Robinson's girlfriend at the time, also witnessed the murder and could have corroborated his story, Robinson could not remember her last name, what street she lived on, and said he would not be able to provide information to help locate her. *Id.* (citing N.T., 6/1/23, at 46-48).

The court stated that the credibility of Robinson's account was further undermined by his statement that there were only two shooters involved in Jacobs' killing, which was contradicted by trial evidence showing three different caliber weapons were likely used during the shooting. *Id.* (citing N.T., 7/12/12, at 199-208, 225); *see also* N.T., 6/1/23, at 15, 18-19. Finally, the court cited Robinson's testimony that each of the three individuals involved in the shooting were larger than Appellant at approximately 5 feet 10 inches to 6 feet tall and approximately 200 pounds, while stating that Appellant was

only 5 feet 5 inches and "a hundred pounds soaking wet." However, the Commonwealth admitted into evidence a "wanted poster" created shortly after the incident with a photograph of Appellant and biographical data showing that Appellant was 5 feet 11 inches and weighed 165 pounds. PCRA Court Opinion, 9/13/23, at 11 (citing N.T., 6/1/23, at 16, 77-78; Exhibit C-2).

Upon careful review, we conclude that the PCRA court's bases for finding Robinson's testimony incredible are supported by the record. *See Small*, 238 A.3d at 1280 (this Court is bound by PCRA court's supported factual findings and credibility determinations). Moreover, we agree with the lower court's legal determination that, absent Robinson's testimony, Appellant could not prove that the Commonwealth suppressed favorable evidence. *See, e.g.*, *Commonwealth v. Busanet*, 54 A.3d 35, 48-49 (Pa. 2012) (holding that defendant had failed to prove that there was any "exculpatory or impeaching evidence that the Commonwealth had an obligation to disclose under *Brady*" where PCRA court found the Commonwealth's evidence was more credible on the issue of whether the alleged *Brady* material—a cooperation agreement with the Commonwealth's key witness—existed). Therefore, we find it unnecessary to entertain Appellant's request that we engage in a prejudice analysis balancing any credibility issues with Robinson's account of the murder against any alleged deficiencies in the proof presented by the Commonwealth at trial. The order dismissing Appellant's October 14, 2022 amended PCRA petition is affirmed.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/10/2024